## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MARK KEVIN MUSE,** | : | **CIVIL ACTION NO. 1:04-CV-1302** |
| | : | |
| **Petitioner** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **MARDI HUNSBERGER, et al.,** | : | |
| | : | |
| **Respondents** | : | |

### MEMORANDUM

Presently before the court is a petition for writ of habeas corpus in which

petitioner, Mark Kevin Muse, demands release from state custody on grounds that

the jury trial underlying his conviction on charges of rape, burglary, and assault

was infected by ineffective assistance of counsel and improper prosecutorial

remarks.  A review of the record of state proceedings demonstrates that these

claims are without merit.  The petition will be denied.

## I.     Statement of Facts

A criminal complaint was filed against Muse on December 13, 1997, charging

him with the sexual assault of a young woman.  The woman had reported to police

that, at approximately 3:00 a.m., an intruder had entered her home.  He accosted

her while she lay in bed, forcibly removed her clothes, and raped her.  He then left

the room, with the threat that she would be killed if she "went for the door."

Despite the darkness of the early morning hours, the victim recognized the

attacker's voice as that of Mark Kevin Muse, the stepfather of her boyfriend.  (Doc.

1, Attach. 1 at 5-6; Doc. 12 at 2; Doc. 21 at 81a-100a, 189a-93a).

Later that day, at approximately 10:00 a.m., police arrested Muse.  He was advised of his rights, and, in response to questions about the assault, professed his innocence.  He told officers that, on the night of the incident, he had been drinking at a local establishment.  He had gone home at about 11:00 p.m. and, after "tinkering" in the garage and watching a movie on television, had gone to sleep. He had been asleep from 12:20 a.m. until 6:30 a.m., during the times when the assault occurred.  The next day, Muse contacted police to inform them that, contrary to his previous statement, he had not gone directly home from the local drinking establishment but had gone to a party at a private residence.  He had left the party to go home at about 1:30 a.m., and had been asleep at the time of the assault.  (Doc. 22 at 271a-81a, 463a-82a).

Trial on charges of rape, burglary, and assault commenced on February 1, 1999.  The victim testified about the incident, and identified Muse as her attacker. Other individuals, who resided near the victim's home, recalled that they had seen a small car, matching the description of a vehicle owned by Muse, speed away from the area shortly after the assault.  Officers who had interviewed Muse recounted his statements, including the discrepancy regarding the party and the time he arrived home.  Defense counsel suggested, during cross-examination of the officers, that, because the fact of Muse's "whereabouts . . . later that night . . . is helpful to the prosecution," there was no reason to doubt Muse's veracity. (Doc. 21 at 75a-154a; Doc. 22 at 264a-329a).

A forensic scientist with the Pennsylvania State Police, who had examined genetic materials from the scene of the assault, also testified.  She stated on direct examination that she could "not detect DNA from Mark Muse in these results," but suggested that this result was possibly explained by Muse's prior vasectomy, which limited the DNA present in a semen sample.  Counsel for Muse exploited this admission.  He asked the expert on cross-examination to repeat that no DNA from Mark Muse had been discovered in the materials analyzed.  He then explored the testing techniques, and secured a concession from the expert that an individual with a vasectomy could leave traceable DNA.  (Doc. 21 at 168a-83a).

Muse took the stand in his own defense.  He recounted the prior statements given to police and stated, in response to a question from defense counsel, that he had not told officers about the party at the time of his initial statement because he had been "scared to death."  Counsel for the prosecution cross-examined Muse about his prior statements, including the following exchange:

> Q    You obviously gave a lot of thought about this night, this early morning, what you told the police, didn't you?
>
> A    Not really.
>
> Q    No.  At some point did you remember that you hadn't told him about the party . . . ?
>
> A    I didn't remember that until the next day, after I had time to I guess gather my thoughts.
>
> Q    And you called the police at that time and offered that additional statement.

3

Defense counsel immediately objected, requesting a mistrial on grounds that the questions represented a "blatant violation of [Muse's] right to remain silent as an accused." (Doc. 122 at 465a, 477a-78a).

The presiding judge sustained the objection and offered to issue a curative instruction. Defense counsel declined this invitation, and asked that the judge simply state that the question is stricken and tell counsel to "move on." The judge agreed. He announced that the objection was sustained, that the question was stricken, and that counsel should "move on." The timing of Muse's statements to police was not raised again during the course of the three-day trial. The inconsistency in the statements was touched upon briefly by *defense counsel*, who suggested during re-direct of Muse that he had "no reason to hide that [he] was at a party." (Doc. 122 at 478a-82a).

At the conclusion of proceedings, the jury returned a verdict of guilty on all counts. Muse's subsequent appeals were denied or dismissed. (Doc. 1, Attach. 1 at 5-6; Doc. 12 at 2-3; Doc. 22 at 609a).

## II.    Discussion

The "Great Writ" allows prisoners in state custody to challenge the legality of their detention in the federal judiciary. See Barnhart v. Kyler, 318 F. Supp. 2d 250, 254 (M.D. Pa. 2004) (citing Ex parte Royall, 117 U.S. 241, 247-53 (1886)). Those petitioning for release from custody bear the burden of proving that, due to errors in their conviction or sentence, their continued custody represents a violation of rights guaranteed under the United States Constitution. See 28 U.S.C. § 2254(a). If

4

this showing is made, the federal court has the "authority—indeed the

obligation—to . . . order the release of the prisoner." Barnhart, 318 F. Supp. 2d

at 254.

Muse asserts that his appointed counsel failed to "bring forward . . . DNA

evidence," in violation of his right to effective assistance of counsel under the Sixth

Amendment, and that the prosecution's cross-examination improperly referenced

his post-arrest silence, in violation of his right to due process under the Fourteenth

Amendment.  These claims will be address in turn.

### A.    Sixth Amendment

The Constitution guarantees the availability and adequacy of counsel to

assist individuals charged with a felony offense in presenting their defense. E.g.,

Gideon v. Wainwright, 372 U.S. 335, 344 (1963).  Counsel appointed to represent an

indigent defendant must act in accordance with professional obligations and must

provide reasonably effective assistance. Strickland v. Washington, 466 U.S. 668,

687-94 (1984).  An individual whose counsel fails to satisfy this minimal

constitutional standard of "reasonableness," resulting in his or her conviction, has

been deprived of the Sixth Amendment right to counsel. Id.

Muse's claim that his counsel was ineffective for "fail[ing] to bring

forward . . . DNA evidence" (Doc. 1 at 10) is contradicted by the record of trial.

Blood samples from the victim, the victim's boyfriend, and Muse were compared by

an expert forensic scientist against genetic material secured from the victim's body

and areas surrounding the sexual assault.  The results of this analysis showed that

all of the genetic materials matched the victim and the victim's boyfriend.  None of

them matched Muse, and none was "unaccounted for."  Defense counsel cross-

examined the expert on the technique used to analyze these materials and secured

a clear admission that he "did not detect . . . Muse's DNA" in any of the materials

tested.  (Doc. 22 at 168a-84a).

Muse's defense was premised in part that a person, possibly named "Todd,"

had actually committed the crime.  (See Doc. 21 at 72a-75a).  However, the expert

testified that the genetic materials taken from the scene of the assault had been

tested against a broad array of DNA samples maintained by the "crime lab" of the

Pennsylvania State Police and that *all* of these materials had been matched to

either the victim or the victim's boyfriend.  In light of this testimony, there was no

reasonable basis on which defense counsel could have pursued further inquiry and

no additional "DNA evidence" that counsel could have brought forward.

Counsel's performance under these circumstances was constitutionally

"effective."  See Strickland, 466 U.S. at 687-94.  Muse did not suffer a violation of his

rights under the Sixth Amendment.

### B.    Fourteenth Amendment

The Due Process Clause assures that state criminal proceedings will be

"fundamentally fair" to the defendant.  See, e.g., Doyle v. Ohio, 426 U.S. 610, 616-19

(1976).  One of the protections falling within this general guarantee is that the post-

arrest silence of an accused, who has been advised of the constitutional right to

remain silent, will not be introduced against him or her at trial to draw an

inference of guilt.  See id.  Implicit in this advice, given to all arrestees pursuant to

Miranda v. Arizona, 384 U.S. 436 (1966), is the assurance that the invocation of the

right to remain silent "will carry no penalty."  Doyle, 426 U.S. at 618.  To allow the

prosecution to renege on this implied promise, and use post-arrest silence to

impeach the individual's exculpatory testimony at trial, would be "fundamentally

unfair" and represent "a deprivation of due process."  See id.

This is not to say that the Fourteenth Amendment imposes an absolute bar

on any mention of post-arrest silence.  Unintended references or stray remarks

about an individual's silence after arrest do not, without more, violate the Due

Process Clause.  See Greer v. Miller, 483 U.S. 756, 763-64 (1987).  Nor is the

prosecution precluded from using post-arrest silence to contradict an inconsistent

statement made by the defendant on the witness stand.  See Doyle, 426 U.S. at 619

n.11.  Rather, the concern of the Due Process Clause is the *exploitation* of post-

arrest silence "to draw an impermissible inference of guilt."  See Hassine v.

Zimmerman, 160 F.3d 941, 947 (3d Cir. 1998).  Only when there is an element of such

manipulation is the Due Process Clause offended.  See id.; see also Greer, 483 U.S.

at 763-65; United States v. Johnson, 302 F.3d 139, 147-48 (3d Cir. 2002).

The brief, ambiguous reference to post-arrest silence in this case does not

evince such motivation and did not have an exploitative effect.  The prosecutor did

not raise the timing of Muse's statements, or his failure to mention the party during

his first statement, *sua sponte*.  Muse had previously testified, in response to

questions from defense counsel, that he had given police contradictory accounts of

his whereabouts on the night of the assault.  It was appropriate for the prosecutor to examine the circumstances under which these statements were made in order to establish the discrepancy and to suggest to the jury that his testimony could be discounted on this basis.  The prosecutor's questions were not an exploitation of post-arrest silence, but a permissible method to establish the contradiction in Muse's statements.  No due process violation occurred.  See id.

Moreover, assuming *arguendo* that the reference to post-arrest silence exceeded permissible bounds, it is clear that these trial errors did not prejudice Muse or contribute to the jury's determination of guilt.  See Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) ("[P]etitioners . . . are not entitled to habeas relief based on trial error [such as a reference to post-arrest silence] unless they can establish that it resulted in 'actual prejudice.'").  The remarks at issue were made near the end of Muse's cross-examination, after a string of questions and answers covering his prior statements and after the jury had been informed, by *defense counsel*, that Muse had offered conflicting accounts of the night of the assault.  The remarks elicited an immediate objection from defense counsel and were stricken from the record.  The issue of Muse's post-arrest silence was not raised by the prosecution again during the course of the three-day trial, during which the victim and many others offered testimony linking Muse to the assault.  Under these circumstances, the brief reference to post-arrest silence, even if in error, was harmless.  See id. at 638-39; see also Greer, 483 U.S. at 763-65; Johnson, 302 F.3d at 147-48.

8

## III.    <u>Conclusion</u>

The claims of constitutional error raised in the petition for writ of habeas

corpus are without merit.  Muse's counsel acted reasonably in his presentation of

evidence relating to DNA found at the scene of the assault, and the brief reference

by the prosecution to Muse's post-arrest silence was not intended to, and did not,

have the effect of drawing an inference of guilt.  No violation of the Sixth or

Fourteenth Amendments occurred.  The petition will be denied.[1]

An appropriate order will issue.

S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge

Dated:        August 25, 2005

---

[1] The court's disposition of the claims on their substantive merits renders it unnecessary to consider whether Muse properly exhausted these issues in the state judiciary or whether the decisions of the state courts rejecting the claims were "unreasonable" in light of federal law.  <u>See</u> 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); <u>id.</u> § 2254(d) (prohibiting the grant of a petition for writ of habeas corpus "with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim" involved an "unreasonable application" of federal law or "unreasonable determination" of facts).

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MARK KEVIN MUSE,** | : | **CIVIL ACTION NO. 1:04-CV-1302** |
| | : | |
| **Petitioner** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **MARDI HUNSBERGER, et al.,** | : | |
| | : | |
| **Respondents** | : | |

## <u>ORDER</u>

AND NOW, this 25th day of August, 2005, upon consideration of the petition

for writ of habeas corpus (Doc. 1), and for the reasons set forth in the

accompanying memorandum, it is hereby ORDERED that:

1.   The petition for writ of habeas corpus (Doc. 1) is DENIED.

2.   A certificate of appealability is DENIED.  <u>See</u> 28 U.S.C. § 2253(c).

3.   The Clerk of Court is directed to CLOSE this case.


   S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge